**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

**vs.**                                                                 **No. 1:18-CR-02945-WJ**

**JANY LEVEILLE, et al.,**

        **Defendants.**

**RESPONSE TO UNITED STATES' OBJECTION TO SPECIFIC QUESTIONS WITHIN
DEFENDANT'S SPECIAL JURY QUESTIONNAIRE**

Defendant Subhanah Wahhaj, through counsel, The Law Office of Ryan J. Villa, by Ryan J. Villa, and Justine Fox-Young, PC, by Justine Fox-Young, submits this Response to the United States' Objection [Doc. 823]. The government does not oppose the questions numbered 1, 2, 3, 5, 6, 8, 9(a), 10, 13, 14, 15, 16, 17, 18, 19, 24, 30, 32, 33, and 56 being included in a special questionnaire if the Court permits one. Thus, Ms. Wahhaj requests the Court include these questions in a special questionnaire. Contrary to the government's arguments regarding the remaining questions, they are appropriate to include in the special jury questionnaire (SJQ), and the Court should include them for the reasons identified herein.

**ARGUMENT**

While the government agrees that a larger than normal venire is needed for this case, the government indicates that the Court's standard questionnaire is sufficient. Ms. Wahhaj disagrees. The reason a large panel is needed is because the parties anticipate a large number of cause challenges due to the nature of this case. This case is rife with issues that are sensitive, personal, and controversial, and frequently lead to cause challenges. This case includes the death of a child and terrorism charges against black, Muslim Defendants. Juror's potential prejudice on these subjects must be fleshed out during jury selection to ensure a fair and impartial jury.

"[F]ederal judges have ... ample discretion in determining how best to conduct the voir dire." Rosales-Lopez v. United States, 451 U.S. 182, 189 (1981). The proposed SJQ would greatly reduce the amount of in court time needed to explore the numerous "hot-button" issues this case presents. The SJQ would be answered under oath, *see* SJQ cover page [Doc. 815-1], and thus serves the same function as voir dire questions. It will not only assist in ensuring a fair jury is sat, but also assist counsel in exercising peremptory strikes. *Mu'Min v. Virginia*, 500 U.S. 415, 431 (1991) ("*Voir dire* examination serves the dual purposes of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges."). *See Equal Employment Opportunity Comm'n v. BOK Fin. Corp.*, 2014 WL 12628594, at *2 (D.N.M. Mar. 20, 2014) (stating supplemental juror questionnaires are generally reserved for cases directly implicating sensitive, personal, or controversial issues) (citing *Lujan*, CR 05-0924 RB (gangs, drug use, child abuse); *Lowery v. City of Albuquerque*, 2012 WL 1372273 (D.N.M. Apr. 11, 2012) (governmental authority, drug use, health risks); *United States v. Sandoval*, 2006 WL 1304955 (D. N.M. Feb. 1, 2006) (incest, sexual abuse of child).

"District courts routinely employ questionnaires to facilitate *voir dire* in a number of circumstances, *e.g.,* where a large number of prospective jurors must be screened [and] … where there has been extensive pre-trial publicity." *United States v. Quinones*, 511 F.3d 289, 299 (2d Cir. 2007). *See Skilling v. United States,* 561 U.S. 358, 384-90 (2010) (noting the efficacy of an extensive screening questionnaire in a trial with significant publicity to ensure fair and impartial jurors who were not prejudiced by media coverage). "Courts resort to extensive jury questionnaires in such circumstances as where lengthy voir dire may be necessary, many prospective jurors are likely to be ineligible, an anonymous jury procedure is used, questions regarding extensive pretrial publicity carry a serious risk of prejudicing potential jurors, or the case directly implicates

sensitive, personal, moral or religious issues." *United States v. Jackson*, 863 F. Supp. 1449, 1459 (D. Kan. 1994). Questionnaires also serve "to conserve judicial resources by saving a substantial amount of time relative to a jury selection process in which the entire voir dire is conducted orally." *United States v. Dervishaj*, 2015 WL 3794803, at *1 (E.D.N.Y. June 17, 2015).

The government's objections are overall inadequate, fail to comprehend the purpose of an SJQ, focus only on whether a question could lead to a cause challenge even though the parties are entitled to ask questions to determine whether to exercise a peremptory strike, and raise unwarranted concerns that the jury will not follow the Court's instructions or might plant ideas in the jury's mind. The government offers no explanation for most of its concerns and cites no legal authority. Accordingly, the Court should overrule the objections.

**A. Background Information**

1. <u>Question 4</u>. The government opposes this question because it asks the prospective jurors to provide their race and ethnicity. First and foremost, this question is essential for Defendants to raise any *Batson* challenges if the government exercises peremptory challenges in a way that gives rise to such a challenge. *See Batson v. Kentucky*, 476 U.S. 79, 96 (1986) (holding defendant can challenge peremptory strikes of jurors who are of the same race as defendant as discriminatory); *Powers v. Ohio*, 499 U.S. 400, 415-16 (1991) (holding a defendant in a criminal case can raise the third-party equal protection claims of jurors excluded by the prosecution because of their race regardless of whether the juror is the same race as defendant). Here, Ms. Wahhaj is a member of a cognizable group as she is African American. It is essential to know the race or ethnicity of prospective jurors if peremptory strikes are used on black jurors by the government. *United States v. Esparsen*, 930 F.2d 1461, 1467 (10th Cir. 1991) ("when analyzing the use of peremptory challenges, it becomes both more realistic and important to identify precisely the race

of venire members" rather than rely on surnames"). The percentage of a certain race who are stricken by the government may help determine if a *Batson* violation occurs, which is much easier to determine by asking each juror in the SJQ. *See id.* (stating preference to know juror's race, rather than rely on surname, when comparing percentages of certain race jurors struck); *Davis v. Ayala*, 576 U.S. 257, 274 (2015) (in ruling on *Batson* challenge, Court noted the importance of having questionnaire's in record which identified the juror's race).

Identifying jurors' race and ethnicity in the SJQ will save valuable time during voir dire in the event a *Batson* challenge is raised. The alternative is to have the jurors do it during voir dire, which is unnecessarily burdensome. Moreover, the SJQ allows the juror to provide this information in a more confidential manner, rather than in open court before the whole jury panel.

Furthermore, as will be discussed below, given the facts of this case, the Court should permit questioning on racial bias or prejudice. *See Rosales-Lopez v. United States*, 451 U.S. 182, 189 (1981) (holding constitution requires inquiry into racial prejudice where substantial indications of the likelihood of racial or ethnic prejudice affecting jurors exist in a particular case; and, if no such circumstances are present, court still has discretion to permit such questioning). Knowing a prospective juror's race or ethnicity will assist in determining if that juror may harbor racial animus toward a particular group.

2.      Question 7: The United States objects that asking a prospective juror which job was their favorite will not help discern whether the juror can be fair and impartial. While the fact of a favorite job in and of itself may not be enough to disqualify a prospective juror, this fact in conjunction with others might. For instance, if the juror's favorite job involved working with children because they are partial to children, and the juror then indicates they could have trouble sitting on a jury involving charges of kidnapping resulting in death of a child. There is no rule or

law, and the government cites to none, that each question posed to a prospective juror must be such that the answer will reveal whether the juror can be fair and impartial. Many questions, if not most questions to prospective jurors are not designed to lead to a disqualifying answer, but instead are used to establish on overall picture of the juror such that if they provide a potentially disqualifying answer, the parties can inquire further into that answer to determine if the juror can be sat. *Skilling*, 561 U.S. at 388(stating that the questionnaire "helped to identify prospective jurors excusable for cause and served as a springboard for further questions put to remaining members of the array."). The questions on the SJQ are also asked to help determine when to exercise a peremptory strike, even if the information does not create grounds for a challenge for cause. *See United States v. McAnderson*, 914 F.2d 934, 942 (7th Cir. 1990) ("An adequate *voir dire* must also provide the defendant the information necessary to exercise his right to peremptory challenges.").

3.    Question 9(b): The government similarly objects to this question about whether a juror with military service served in "active combat," and if so, which conflict, because it will not help determine if the juror can be fair and impartial. This is clearly wrong in light of the terrorism charges in the case. This question is much more likely to reveal bias on its face than many of the others which may be more background in nature. Defendants are charged with providing material support to terrorists. The government's expert witness will testify Defendants were home-grown terrorists. If a prospective juror served in active combat against a terrorist organization, rather than another nation-state, they may be more likely to harbor bias against a defendant who is accused of terrorism. Even if they do not state they hold such bias, Defendants are entitled to ask this question to help determine whether to exercise a peremptory strike. *McAnderson*, 914 F.2d at 942. The government claims this question is vague, but there is simply nothing vague about it and the variety of combat scenarios the government suggests could result in a yes answer, can be partially

explained by the next question which asks which conflict or theater the juror was in active combat, and can be inquired upon further during voir dire if it is still unclear.

4.      Question 11: The government objects to asking for a juror's spouse's place of employment and education. There is nothing improper about this question. The questions do not have to relate to a prospective juror's ability to be fair, but instead can be one fact among many to help the court rule on a challenge for cause or can aide the parties in exercising peremptory strikes. Like with the juror's favorite job, the spouse's education or employment, for instance if the spouse works with children or is in a law enforcement or counter-terrorism field, may lead to challenges for cause.

5.      Question 12: Here again the government's objection demonstrates an incredibly parochial view of the purpose of an SJQ and voir dire. Astonishingly, the government believes questions about a juror's children's age and whether they live at home—in a case involving the death of a young child—is only relevant to a hardship inquiry. In fact, whether the juror cares for young children is pertinent to whether they may have difficult being fair and impartial to Defendants who are charged with kidnapping a young child who allegedly ultimately died in their care. If a person does care for young children, it follows that they may be bias against a defendant who may have caused the death of a young child in their care. Asking these questions ahead of time will save valuable court resources during voir dire.

**B.  Publicity and Media Section**

6.      Questions 20 through 23: The government objects to including a description of the case in a court-issued jury questionnaire, notwithstanding that this is done all the time in criminal and civil cases. The government suggests that providing such a description would plant an idea about the nature of the case in the juror's mind and this would invite them to search for and read

about the case notwithstanding the order by the Court not to do this. The cover page of the SJQ

instructs:

> You are instructed by the Court not to discuss anything about this case with anyone, even your spouse or significant other, nor are you to research this case or anything related to it, by any means, including the internet, social media, radio, newspapers, discussions with others, or in any other manner. Your failure to abide by this directive may result in contempt of court proceedings against you, and a possible fine and/or imprisonment.

*See* Doc. 815-1, at page 1. This is an elementary view of jury selection. The bottom line is that the

jurors need to be informed of the charges and the nature of the case so that both sides can explore

potential bias. This can be done during voir dire in a much longer, slower process, or it can be

done ahead of time and jurors can be trusted to follow the instructions of the Court, just as they

are when they arrive at trial. Thousands of trials proceed this way throughout the country and the

vast majority of the prospective jurors have no trouble keeping an open mind after reading a short

description of the case and following the judge's instructions not to conduct research on the case.

7.     The government claims if the case description includes the Defendants' religion or

race that prospective juror's independent ability to reason will be overwhelmed, leading them to

believe Defendants were targeted for indictment because of their religion or race. This is quite a

leap. The government first argues that because the word Muslim is not in the indictment, it cannot

be in the case description. This argument is meritless as it is quite common to discuss aspects of

the case in voir dire that are not mentioned in the indictment. Further, discussing a true fact about

Defendants which will be presented as evidence during the trial is essential to determine whether

a jury may harbor prejudice when they hear about that fact. It is no secret that some people believe

those of the Muslim faith may hold extremist views consistent with terrorist activity. Defendants

are entitled to a jury comprised of people who do not prejudge anyone simply because they are

Muslim. The only way to ensure this happens is by asking prospective jurors.

8.     The government also takes the extreme view that naming Defendants would lead prospective jurors to seek media articles about the case, which would taint them. First, simply because a juror reads a media article about this case, does not taint them. If a juror has read any such articles, they must then be asked whether reading that article has caused them to prejudge the case. *See Mu'Min v. Virginia*, 500 U.S. 415, 431–32 (1991) (holding no constitutional violation by failing to excuse jurors who read articles about the case where those jurors stated they did not form any opinions about the case after reading the articles). Second, as discussed in paragraph 6, it is well accepted that jurors will follow the Court's order not to look up media articles. Because there has been so much widespread media attention, both in 2018 and 2019 when the case began, and recently this year, it is much more efficient to discuss these issues ahead of time.

9.     Question 25 through 27: The government objects to these questions on the grounds they mischaracterize the facts of the case and risk planting ideas in the juror's mind, but the questions do not discuss the facts of the case. Instead, the questions ask about common circumstances a juror or a juror's family or friend may have experienced involving child custody disputes that have some similarity to the facts in this case. There is nothing improper about asking this type of question and the government cites no law to the contrary. In car crash cases jurors are asked if they have ever been in a car crash. In criminal cases, we ask jurors if they have been crime victims. The government again claims the questions will plant ideas into the minds of the jurors, but the jurors are only provided a small, non-argumentative summary of the case on page 3 of the SJQ. It is quite something to believe that this summary in conjunction with the proposed questions can plant the ideas the government suggests. By this rationale, a prospective juror cannot be told anything about the case and cannot be asked about any experience in their life that may relate to the case to determine if they may harbor prejudice, because, according to the government, we

cannot trust that jurors will be able to discuss those experiences without "planting" ideas about this case. This is not a proper basis to deny exploring whether a juror's past experiences may prevent them from fairly judging the facts of this case or whether the parties wish to exercise a peremptory strike due to a juror's past experience. The government has no basis to believe that these questions in the SJQ will somehow plant ideas about the facts of the case in the juror's mind. The jurors will be instructed to determine their verdict based solely on the evidence that is presented in court, and the jurors will be asked before trial whether they can follow that instruction.

10.     Question 28: The government claims this question somehow suggests facts about the case to the jury. It makes no such suggestion. For the same reasons discussed in paragraph 9, the government's claims that a prospective juror can glean inferences about case facts that they do not know, have never heard, or had presented to them, from a question like question 28, should be rejected.

11.     Question 29: The government objects to this question along the same lines as questions 25 to 28, but this time the government takes a step further, suggesting that somehow this question is designed to provide a defense for the Defendants charged with kidnapping. The question asks about whether a prospective juror disagreed with a parenting decision of a friend or family member. It is not clear how a prospective juror who reads a brief, non-argumentative statement of the case as proposed on page 3 of the SJQ could come to this incredible conclusion and the government does not provide any explanation. Accordingly, the objection should be overruled.

**D. Courts and Community Section**

12.     Question 31: Ms. Wahhaj does not object to the government's proposed modification to include the words "or less." Ms. Wahhaj agrees with the government that a yes

answer would be concerning, but it is not enough information to raise a cause challenge. The juror's explanation may help assist the parties in this regard or lead to one or two short follow-up questions during voir dire, rather than having to go through this questioning of the whole panel during voir dire. The explanation will also inform the parties on whether to exercise a peremptory strike.

13.     Question 34: The government does not object to asking this question in voir dire, but does object to asking it in the SJQ. It does not explain why it is objectionable in the SJQ but not voir dire. One of the key purposes of the SJQ is to minimize court time and ask questions ahead of time that could be asked in voir dire. To be sure, the law treats the answer the same whether it's in the SJQ or in voir dire as the SJQ questionnaire is answered under oath. The government also incorrectly suggests that gun ownership by the juror or their family would not lead to a cause challenge. Here, Defendants are all charged with illegally providing Ms. Levielle with firearms when she is not allowed to possess them. Thus, their views on guns and gun charges may lead to cause challenges. The parties are also entitled to know these views to determine whether to exercise a peremptory strike.

14.     Subpart b, the reasons for gun ownership, are relevant for the same reasons. Moreover, there is nothing inappropriate about asking jurors in a gun case the reasons they own guns. Once again, the government offers no law to support its claim that his question is inappropriate for voir dire.

15.     The same is true for part c. Whether it is narrative building or not, the frequency one uses a gun is relevant to a gun case and is not improper.

16.     Question 35: The government objects to the word serious, and also to the use of the question in the SJQ in general. The government offers no explanation as to why. It is certainly

appropriate to distinguish between cases that are serious and those that are not. A juror's predisposition to a crime is likely to change if it is a serious one versus something minor. The government also continues to try and gaslight the Court and Defendants by claiming this case is not a terrorism case. Ms. Wahhaj incorporates here arguments in his regard from her Response [Doc. 810]. If this is not a terrorism case (even though the US Supreme Court and the government's expert says it is) the Court should dismiss the terrorism charges in the Indictment. Otherwise, the jury will be read the indictment which in Count One is Conspiracy to Provide Material Support to *Terrorists*, and Count Two, Providing Material Support to *Terrorists*. If these two charges are not dismissed, the jury should be questioned about topics related to terrorism.

17.     Questions 36 and 37: These questions ask about how a juror thinks innocent people can be found guilty, a phenomenon that exists and is well-documented, and then asks the jurors how to prevent this. The government reads into the question, with absolutely no basis, that the questions impart the notion that the Court believes innocent people are *regularly* convicted. This is nonsense. The questions do no such things. The innocence of a defendant is at the very heart of what a prospective juror must decide and asking about wrongful convictions is not inappropriate in any way.

**E. Society and Religion Section**

18.     Question 38 through 41: Questions about religion are appropriate for the same reasons questions about race are appropriate in this case. Defendants are black Muslims accused of terrorism. Given the history of terrorism in this country from groups claiming to practice Islam from 9/11 to Al Qaeda to Isis, exploring jurors' views on the subject is critical to determine if they can be fair and impartial to Muslim Defendants accused of terrorism, as well as whether to exercise a peremptory strike. The government suggest the focus on Christianity is somehow suspicious, but

it is not. Those who do practice religion in New Mexico and the United States primarily practice Christianity. Other religions are practiced, but by a vastly smaller number of people. Thus, the questionnaire is comparing jurors' views on Christianity with those on Islam to determine if there is a difference. Questions 38 through 45 should be viewed as a whole because the answer to these questions will help ascertain potential prejudice.

The government argues the questions should be more like those asked in *United States v. Sandoval*, 2006 WL 1304955, at *1 (D.N.M. Feb. 1, 2006), but that case involved the sexual assault of a minor. It had nothing to do with terrorism. The government wants to ignore the last 21 years of history in the United States since 9/11 that involve terrorism with groups who claim to practice Islam and treat this case like any other. Other Courts have recognized the importance in terrorism trials to question jurors about potential bias toward Muslims. *See United States v. Rahman*, 189 F.3d 88, 122 (2d Cir. 1999) (holding no error in seditious conspiracy trial against Arab, Muslim arising from plots to bomb various locations in New York City where trial court summoned 500 prospective jurors and asked extensive questions about jurors' feelings and knowledge on Islam, and persons who are Muslim or of Arab descent); *Subasic v. United States*, 2018 WL 3631884, at *8 (E.D.N.C. July 31, 2018) (trial court did not err because Court asked venire if it heard that defendant or others allegedly involved in the crimes at issue are Muslim, would they assume that the defendant is guilty, and multiple jurors were dismissed who indicated possible bias towards the Muslim community). *See also United States v. Shalhout*, 507 Fed. Appx. 201, 204 (3d Cir. 2012) (holding Muslim, Arabic Defendants on trial for fraud could not voir dire on prejudice because they were not charged with crimes of violence or terrorism). This objection should be overruled.

19.     Question 42 and 43: For the same reasons discussed in paragraph 18, this objection should be overruled.

20.     Question 44 and 45: For the same reasons discussed in paragraph 18, this objection should be overruled.

21.     Question 45: For the same reasons discussed in paragraph 18, this objection should be overruled.

22.     Questions 46 and 47: These concern questions about using faith-based approaches in favor of conventional medicine and the rights of parents and families to make decisions in this regard. The questions have nothing to do with whether Siraj had a lawful right to kidnap AG or whether AG received his medical care and treatment. Instead, the questions explore prospective jurors' beliefs on this subject. Because there will be evidence presented that faith-based healing was attempted on AG and potentially caused his death, it is important to explore whether any juror has any preconceived notions or opinions on this subject. There is a high-risk in this case that a juror could convict Defendants based on bias or prejudice related to faith-based healing, even though they are not guilty of kidnapping, because it was Siraj who took his son AG, and this does not constitute the crime of kidnapping. In other words, a juror who is highly biased or prejudiced against anyone who relies on religion over medicine, could find Defendants guilty, even though they are not guilty of kidnapping. Thus, it is important to know if a juror has opinions about faith-based healing, and can set aside those opinions, and just decide whether a kidnapping occurred, even though it is legally not possible for Siraj to kidnap his own son.

23.     Questions 48 through 53: The evidence the jury will hear is clearly consistent with cult behavior. It does not matter whether it is a defense or a crime, the jury will hear it and it is important to know if the jury has any preconceived notions about cults that might prejudice them

or cause them to convict Defendants of crimes when they might otherwise acquit because of their biases toward cults.

**F. Other Life Experience and Knowledge Section**

24.     Questions 54, 55, 57, and 58: These questions all concern issues and evidence the jury will hear about, including seizure disorders, schizophrenia, expert testimony from mental health professionals, and earthships. Questions concerning jurors' experience and knowledge of these issues is clearly relevant to challenges for cause and peremptory strikes.

25.     The government complains about the description of earthships but does not offer a counter-description or explain how the explanation is incorrect. Accordingly, the objection should be overruled.

26.     Question 59: Today, social media is ubiquitous. Asking about juror's use of it, is as normal as asking about their job or education. It can also lead to cause challenges and peremptory strikes and thus is appropriate for the SJQ.

27.     Question 60: Government is simply wrong that the word *slightly* invites the jurors to respond in the affirmative. Jurors are much stronger-minded than the government gives them credit for.

28.     Question 61: The parties can provide an agreed upon list of names and organizations.

**CONCLUSION**

For all of the foregoing reasons, the Court should overrule the objections and issue the SJQ as proposed.

Respectfully submitted,

/s/ *Ryan J. Villa*
Ryan J. Villa

The Law Office of Ryan J. Villa
5501 Eagle Rock Ave NW Ste. C2
Albuquerque, NM 87113
(505) 639-5709
ryan@rjvlawfirm.com

*/s/ Justine Fox-Young*
Justine Fox-Young
Justine Fox-Young, PC
5501 Eagle Rock Ave NE Ste C2
Albuquerque, NM 87113
(505) 796-8268
justine@foxyounglaw.com

*Attorneys for Defendant Subhanah Wahhaj*


**CERTIFICATE OF SERVICE**

I hereby certify that on July 7, 2023 a copy of the foregoing document was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all counsel of record.

/s/*Ryan J. Villa*
RYAN J. VILLA